IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CODY NICHOLSON, | ) | CASE NO.  5:16-cv-00619 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Cody Nicholson ("Plaintiff" or "Nicholson") seeks judicial review of the final
decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")
denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction
pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to
the consent of the parties. Doc. 15.   For the reasons set forth below, the Court **AFFIRMS** the
Commissioner's decision.

## I.  Procedural History

Nicholson filed an application for Disability Insurance Benefits ("DIB") on June 11,
2013.  Tr. 19, 72, 85, 160-161.   Nicholson alleged a disability onset date of February 1, 2013.
Tr. 19, 60, 160, 176.   He alleged disability due to depression, anxiety, paranoia, bipolar disorder,
panic attacks, and anger outbursts.  Tr. 60, 88, 98, 180.  Nicholson's application was denied
initially (Tr. 88-96) and upon reconsideration by the state agency (Tr. 98-104).   Thereafter, he
requested an administrative hearing.  Tr. 105-106.  On May 4, 2015, Administrative Law Judge
Charles Shinn ("ALJ") conducted an administrative hearing.  Tr. 33-59.

In his May 19, 2015, decision (Tr. 16-32), the ALJ determined that Nicholson had not been under a disability within the meaning of the Social Security Act from February 1, 2013, through the date of the decision.  Tr. 19, 28.  Nicholson requested review of the ALJ's decision by the Appeals Council.  Tr. 14-15.  On February 19, 2016, the Appeals Council denied Nicholson's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

**A.    Personal, vocational and educational evidence**

Nicholson was born in 1989.  Tr. 38, 160.  He dropped out of high school in the tenth grade and obtained his GED.  Tr. 38.  He attempted a semester of college in 2009 but did not finish.  Tr. 38.   At the time of the hearing, Nicholson was staying in a friend's basement.  Tr. 39.  Nicholson has no children.  Tr. 39.   Nicholson worked various jobs mostly for short periods of time.  Tr. 53, 189.  His most recent job was working as a dishwasher at a restaurant.  Tr. 189, 241.  He also worked as a warehouse worker and cleaned kennels at a veterinarian's office.  Tr. 189, 235, 241.

**B.    Medical evidence**

**1.    Treatment history**

On June 17, 2013, Nicholson attended an individual counseling session at Portage Path Behavioral Health ("Portage Path").  Tr. 291-292.   He attended the counseling session to discuss his depression and anxiety.  Tr. 291.  Nicholson reported that he had been homeless for a long time.  Tr. 291.  Also, he reported being hospitalized in the past for depression and anxiety but, due to his unstable housing situation, he did not follow up with treatment or stay on medication.  Tr. 291.   Nicholson indicated he had recently filed for social security disability benefits.  Tr.

291.  He reported that he had also filed for social security when he was 18 years old but did not

follow up.  Tr. 291.  Nicholson was interested in trying medication to treat his anxiety but noted

that he was not sure if he could follow up with his counseling appointment because of his

housing issues.  Tr. 291.  The counselor provided Nicholson with housing resources and walk-in

medication appointment schedule for that month.  Tr. 291.  On mental status examination,

Nicholson's activity was average, he was adequately groomed, his eye contact was average and

his speech was clear.  Tr. 291.  His affect was appropriate, his behavior was cooperative, and his

mood was depressed.  Tr. 291.  His insight and judgment were poor and he had concrete

thoughts.  Tr. 291.

On July 1, 2013, Nicholson saw Dr. Yuan-Hua Thakore, M.D., at Portage Path for a

psychiatric evaluation.  Tr. 281-285.  Nicholson reported having numerous problems, including

depression, anxiety, panic attacks, anger, mood swings, paranoia, decreased energy and

motivation, feelings of guilt, and feelings of hopelessness, helplessness, and worthlessness.  Tr.

281.  Nicholson reported losing work in the past because he has missed worked, been late to

work, and blown up at work.  Tr. 281.  Nicholson reported suicidal ideation.  Tr. 281.  He had

three past suicide attempts but denied feeling actively suicidal or taking his suicidal ideation

seriously.  Tr. 281-282.  He denied homicidal thoughts and he denied hypomania/mania.  Tr.

281.  Nicholson had three prior psychiatric admissions.  Tr. 282.  Two admissions were when

Nicholson was a teenager and the most recent admission was when Nicholson was 23.  Tr. 282.

While in school, Nicholson was in a lot of fights but was never suspended or expelled.  Tr. 282.

He reported being fired from some jobs and quitting other jobs.  Tr. 282.  He indicated he went

to jail for shoplifting three years prior.  Tr. 282.  On mental status examination, Nicholson's

activity was average; he was adequately groomed; his eye contact was average; his speech was

clear; there were no reported delusions or hallucinations; his affect was full; his behavior was cooperative; his mood was anxious and depressed; his insight and judgment were fair; he had logical thoughts; and his cognition was intact.  Tr. 283.

Dr. Thakore's principal diagnosis was mood disorder, NOS.  Tr. 284.  Other diagnoses were intermittent explosive disorder and personality disorder.  Tr. 284.  Dr. Thakore assessed a GAF score of 50.[1]  Tr. 284.  Dr. Thakore offered to start Nicholson on mood stabilizers.  Tr. 283.  Nicholson was not interested in taking Lamictal – the recommended medication.  Tr. 283.  Nicholson stated that he was not willing to take "just any meds, I have taken Klonopin for 10 years and it has worked."  Tr. 283.  He was going to research Lamictal and would return if he was interested in taking the recommended medication.  Tr. 283.  Dr. Thakore recommended that Nicholson follow up with a therapist.  Tr. 283.

On August 15, 2013, Nicholson saw a therapist at Portage Path for an unscheduled visit.  Tr. 287-288.  Nicholson relayed to the therapist that he had seen a psychiatrist on July 1 and he and the psychiatrist did not agree on a medication.  Tr. 287.  Nicholson explained that he was concerned about taking medication like Prozac and Depakote because his friend had taken it and it made his friend slow.  Tr. 287.  Nicholson did not want to be like that.  Tr. 287.  Nicholson indicated that his anxiety had intensified – he was unable to go outside and was "hiding" in his house.  Tr. 287.  He reported breaking up with his girlfriend but they were doing "okay."  Tr. 287.  Nicholson was still having housing problems.  Tr. 287.  Nicholson wanted to talk with

---

[1] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

someone about medication so the therapist suggested that he speak with someone in the medication walk-in clinic.  Tr. 287.  On mental status examination, Nicholson exhibited paranoia; his affect was flat; his behavior was cooperative; his mood was depressed; his insight and judgment were poor; his thinking was concrete; his activity was average; he was adequately groomed; his eye contact was average; and his speech was clear.  Tr. 287.

Also, on August 15, 2013, Nicholson saw Jylia Lobanova, M.D., at Portage Path for medication management.  Tr. 289-290.  Dr. Lobanova noted that Nicholson was a new patient to her.  Tr. 289.  She noted Nicholson's July psychiatric evaluation and diagnoses and that Nicholson had refused mood stabilizers.  Tr. 289.  Nicholson relayed that he had problems with anxiety and depression and was having problems leaving his home.  Tr. 289.  Nicholson indicated that he has problems with anger when he is stressed, anxious and around people and he sometimes gets into fights.  Tr. 289.  However, the problem was not as bad as it used to be.  Tr. 289.  He reported that he did not want to take Prozac or Depakote.  Tr. 289.  Dr. Lobanova noted that he was advised to take Lamictal at the psychiatric evaluation.  Tr. 289.  On mental status examination, Dr. Lobanova observed that Nicholson's activity was average; he was adequately groomed; his eye contact was avoidant; his speech was clear; he had paranoia but no hallucinations; his affect was full; his mood was depressed; his insight and judgment were fair; and his thoughts were logical.  Tr. 289.  Dr. Lobanova also observed that Nicholson was wearing sunglasses throughout the entire visit.  Tr. 289.  Nicholson was started on buspar for his anxiety.  Tr. 290.  Dr. Lobanova explained to Nicholson that the standard treatment for depression and anxiety is anti-depressants and that mood stabilizers can help with his mood and anger.  Tr. 290.  Nicholson was not interested in taking any anti-depressants or mood stabilizers.  Tr. 290.  Dr. Lobanova recommended that Nicholson follow up with a therapist.  Tr. 290.

On August 22, 2013, Nicholson was a no-show for a Portage Path individual psychotherapy appointment.  Tr. 286.  On September 26, 2013, in response to a Social Security Administration request for information, Portage Path indicated that Mental Status or Daily Activities Questionnaires could not be completed because, although Nicholson was an active client, he had not "recently attended, not followed through, or missed multiple appointments." Tr. 294.  On December 2, 2013, Portage Path discharged Nicholson as a client because he "did not return" for over 90 days.  Tr. 295-296.

On February 18, 2014, Nicholson was seen again at Portage Path raising complaints regarding his chronic homelessness; inability to maintain employment long term because his depression and anger get him in trouble and he loses jobs; and paranoia.  Tr. 305-306.  On mental status examination, Nicholson exhibited paranoia; his activity was average; he was adequately groomed; his eye contact was average; his speech was clear; his affect was constricted/blunted; his behavior was cooperative; his mood was anxious and depressed; his thoughts were logical and irrational; and he was fidgety.  Tr. 305.  The therapist noted that Nicholson seemed sincere in his desire to improve and be better able to meet his basic needs.  Tr. 305.

Nicholson attended a therapy session at Portage Path on March 13, 2014.  Tr. 303-304. He was an hour late for his appointment so he was seen on a walk-in basis.  Tr. 303.  Nicholson reported that he was still living in a hotel with his girlfriend and had no hope of finding employment because of his theft record.  Tr. 303.  His days were unstructured and he was limited because of where he was located and he did not have access to a bus line.  Tr. 303.  Nicholson relayed that he had applied for social security.  Tr. 303.  He understood that the social security process could take some time.  Tr. 303.  On mental status examination, Nicholson's activity was

average; he was poorly groomed; his speech was clear; he reported no cognitive impairment, delusions, or hallucinations; his affect was appropriate; his behavior was cooperative and avoidant; his judgment and insight were poor and his thoughts were logical and irrational.  Tr. 303.   As far as eye contact, it was noted that Nicholson was wearing sunglasses during the appointment.  Tr. 303.  Nicholson agreed to work on recognizing and redirecting his negative thoughts and to look for pathways to help overcome his problems.  Tr. 303.  Resources were provided to Nicholson for assistance in the area of housing, vocational rehabilitation and entitlements.  Tr. 303.  It was noted that Nicholson had an upcoming psychiatric evaluation.  Tr. 303.

On April 28, 2014, Nicholson saw Sameera Khan, M.D., at Portage Path for a psychiatric evaluation (Tr. 297-300) and attended therapy (Tr. 301-302).   During his psychiatric evaluation, Nicholson complained of various problems, including anxiety, depression, reckless behavior, racing thoughts, irritability, lack of motivation, self-harm, and fighting.  Tr. 297.  He reported cutting and burning himself and starting fights with other people so they would beat him.  Tr. 297.  On mental status examination, Nicholson's activity was average; he was adequately groomed; his speech was clear; his attention/concentration were impaired; he had visual hallucinations; he was paranoid; his affect was full; his behavior was cooperative; his mood was angry, anxious, depressed, and irritable; his insight and judgment were fair; and his thoughts were irrational.  Tr. 298.  Dr. Khan's principal diagnosis was mood disorder, NOS.  Tr. 299.  Other diagnoses were anxiety disorder, social phobia, and personality disorder.  Tr. 299.  Dr. Khan assessed a GAF score of 50.  Tr. 300.  Dr. Khan prescribed Lamictal to help Nicholson with mood swings.  Tr. 298.  Nicholson agreed to the recommended medication.  Tr. 298-299.

During his April 28, 2014, therapy session, Nicholson relayed that he was going to start taking Lamictal.  Tr. 301.  He reported that he and his girlfriend were renting a room from someone his girlfriend knew.  Tr. 301.  The rent was cheaper and the neighborhood was nice but Nicholson felt that the people they were renting from were too invasive and asked them to do chores and yardwork that were not part of the agreement.  Tr. 301.  Nicholson was concerned about weight that he gained after he had quit smoking and wanted to exercise more but made excuses for not exercising.  Tr. 301.  On mental status examination, Nicholson's activity was average; he was adequately groomed; his eye contact was average; his speech was clear; there were no reported cognitive impairments, delusions, or hallucinations; his affect was constricted/blunted; his behavior was cooperative; his mood was anxious and depressed; his insight and judgment were fair; and his thoughts were logical and irrational. Tr. 301.   The therapist noted that Nicholson appeared more comfortable during the session and appeared to be genuinely interested in change and desire to better himself.  Tr. 302.

On August 6, 2014, Nicholson saw Dr. Khan for medication management. Tr. 307-309.  Nicholson reported that he was not doing well.  Tr. 307.  He stated he had anxiety, depression, and no motivation.  Tr. 307.  He did not want to leave his room.  Tr. 307.  Nicholson indicated that he got very mad and irritated and restless for no reason; his heart raced; he talked fast; he got worked up; and he had twitches.  Tr. 307.  Nicholson indicated that he "did not understand last time about his medication and ha[d] not been on it at all."  Tr. 307.  Dr. Khan prescribed Lamictal again.  Tr. 308.

On January 30, 2015, Nicholson saw Therese Scavelli, M.D., at Coleman Psychiatry ("Coleman") for an initial psychiatric visit.  Tr. 320-325.   Nicholson's disability attorney had recommended that he see someone at Coleman. Tr. 320.  Nicholson stated "It's been pretty bad."

8

Tr. 320.  Nicholson reported a depressed mood, anxiety, anhedonia, and decreased sleep/energy/appetite/concentration.  Tr. 320.  Nicholson indicated that he had problems in social settings – he described getting embarrassed, having chest pain, and leaving.  Tr. 320.  Nicholson was living with his girlfriend.  Tr. 320.  His girlfriend's mother had recently died.  Tr. 320.  He indicated that his finances were a significant stressor.  Tr. 320.  On mental status examination, Nicholson was casually dressed; is demeanor/behavior was average and cooperative; his eye contact was fair; his speech was clear; his mood was dysphoric; his affect was constricted; his thought process was logical; his thought content was  unremarkable; he had no suicidal or homicidal ideation; and he had unremarkable cognitive impairment.  Tr. 322.  Dr. Scavelli diagnosed mood disorder, NOS, and posttraumatic stress disorder.  Tr. 322.  Dr. Scavelli assessed a GAF score of 45.  Tr. 323.  Dr. Scavelli prescribed Lamictal for mood stabilization and Vistaril for anxiety.  Tr. 324.

On March 3, 2015, Nicholson saw Amber Bowers for counseling at Coleman.  Tr. 316-319.  Nicholson continued to report anxiety and depression.  Tr. 317.  Nicholson was living with and relying on his girlfriend.  Tr. 318.  His girlfriend was employed.  Tr. 318.  He was embarrassed about having to rely on his girlfriend but did not have anywhere to go.  Tr. 318.  Nicholson indicated that he had two cats.  Tr. 318.  He played "World of Warcraft" with a friend from high school.  Tr. 318.  He indicated that he wore sunglasses due to his social anxiety.  Tr. 317.  Nicholson was not taking his psych medication due to "a number of side effects and . . . fear of taking meds."  Tr. 317-318.  He reported a lack of self-care and did not like showering or taking off his clothes and reported feeling vulnerable.  Tr. 318.  Nicholson reported that he slept with a knife next to him.  Tr. 318.  Ms. Bowers noted that Nicholson arrived at the visit wearing sunglasses and was avoidant at the start of the session.  Tr. 319.  Ms. Bowers indicated that

Nicholson was cooperative overall and agreed to remove his sunglasses and was engaged during the session.  Tr. 319.  Per Ms. Bowers, Nicholson appeared motivated for treatment.  Tr. 319.

On March 6, 2015, Nicholson saw Dr. Scavelli again.  Tr. 310-315.  Nicholson reported that he stopped taking the Lamictal because he developed a rash and he stopped taking the Vistaril because he was experiencing extreme fatigue and dry mouth.  Tr. 310.  Nicholson would not restart Lamictal and Visteral.  Tr. 314.  Dr. Scavelli started Nicholson on Risperdal for symptoms of psychosis and mood stabilization.  Tr. 314.

On May 1, 2015, Nicholson saw Dr. Scavelli for a follow-up visit. Tr. 330-335.  Nicholson reported "doing a little worse."  Tr. 330.  He had not been sleeping well.  Tr. 330.  He was getting only 2-3 hours of sleep per night and was napping throughout the day.  Tr. 330.  Dr. Scavelli discussed that the nursing/counseling staff had raised some concerns regarding his medication compliance and motivation for treatment.  Tr. 330.  Nicholson indicated he had been taking his Risperdal and hoped to obtain disability.  Tr. 330.  He was feeling more depressed and still having trouble in social settings.  Tr. 330.  Nicholson was also having some ongoing hypervigilance and paranoia.  Tr. 330.  On mental status examination, Nicholson was observed to be somewhat unkempt; his demeanor/behavior was average/mistrustful; his eye contact was fair; his speech was clear; his mood was depressed and his affect was constricted; his thought process was logical and his thought content was unremarkable; he had no suicidal or homicidal ideation; and his cognitive impairment was unremarkable.  Tr. 332.  Dr. Scavelli increased Nicholson's Risperdal for symptoms of psychosis and mood stabilization.[2]  Tr. 334.

---

[2] The administrative record contains additional Coleman counseling records but they post-date the ALJ's May 19, 2015, decision.  Tr. 326-329 (6/11/2015).

2.      **Opinion evidence**

a.  **Consultative examiner**

On August 7, 2013, psychologist Sudhir Dubey, Psy.D., saw Nicholson for a consultative evaluation.  Tr. 271-279.  A friend drove Nicholson to the evaluation.  Tr. 271.  Nicholson reported that his problems included depression and anxiety.  Tr. 271.  Nicholson discussed his past work history explaining that his interaction with co-workers and supervisors was "professional" but he was fired due to his "attendance, depression, and anxiety."  Tr. 273.  Dr. Dubey observed that Nicholson had a history of legal problems, which included disorderly conduct and theft.  Tr. 273.

Dr. Dubey observed that Nicholson's general interaction during the course of interview included behavior that was tense but Dr. Dubey noted that high-risk behaviors were not reported and "observations made of [Nicholson] in the waiting area included that he interacted appropriately."  Tr. 274.

Nicholson reported that typical activities that he performed independently included washing up and showering, changing clothes, shopping for personal items, managing money, managing a daily schedule, managing appointments and paperwork.  Tr. 275.  Nicholson reported having no interaction with his family.  Tr. 272, 275.  He interacts with friends daily.  Tr. 275.  Nicholson reported leaving his home about once a week usually to shop or go to doctor appointments.  Tr. 275.  Nicholson gets rides from others to go places.  Tr. 275.  Nicholson reported having no hobbies at the time.  Tr. 275.

Dr. Dubey diagnosed major depressive disorder, recurrent, mild severity and generalized anxiety disorder and assessed a GAF score of 60.[3]  Tr. 277.   Dr. Dubey assessed Nicholson's work-related abilities.  Tr. 277-278.  Dr. Dubey opined that that, in a work setting, Nicholson would be able to understand, remember and carry out multi-step instructions independently.  Tr. 277.  He opined that, in a work setting, Nicholson would be able to maintain persistence and pace to remember and carry out simple instructions independently.  Tr. 278.  Nicholson would not, however, be able to maintain persistence and pace to remember and carry out multi-step instructions independently due to emotional instability and attention and concentration issues – with supervision, he would be able to perform these types of tasks.  Tr. 278.   Dr. Dubey opined that Nicholson would have some issues dealing with co-workers and supervisors, which Dr. Dubey related to possible problems with mood-related problems leading to associated frustrations for the claimant, coworkers, and supervisors.  Tr. 278.   Dr. Dubey opined that Nicholson would have many issues dealing with work pressure, which Dr. Dubey related to possible problems stemming from attention and concentration issues, and mood-related problems leading to associated frustrations for the claimant, co-workers and supervisors.  Tr. 279.

### b.  State agency reviewers

*Paul Tangeman, Ph.D.*

On August 21, 2013, state agency reviewing psychologist Paul Tangeman, Ph.D, completed a Psychiatric Review Technique and Mental RFC Assessment.  Tr. 65-69.   As part of the Psychiatric Review Technique, Dr. Tangeman opined that Nicholson had no restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate

---

[3]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR", at 34.

difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  Tr. 65.

In assessing Nicholson's Mental RFC, Dr. Tangeman opined that Nicholson had no limitations in understanding and memory.  Tr. 67.

In the area of sustained concentration and persistence, Dr. Tangeman opined that Nicholson had moderate limitations in his ability to work in coordination with or in proximity to others without being distracted by them and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 67-68.  Dr. Tangeman explained further that Nicholson was "capable of work in an environment that does not require fast paced production demands." Tr. 68.

In the area of social interaction, Dr. Tangeman opined that Nicholson had moderate limitations in his ability to interact appropriately with the general public and in his ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 68.  Dr. Tangeman explained further that Nicholson was "capable of work involving superficial contact with others." Tr. 68.

In the area of adaptation, Dr. Tangeman opined that Nicholson had moderate limitations in his ability to respond to appropriately to changes in the work setting.  Tr. 68.  Dr. Tangeman explained further that Nicholson was "capable of work in a predictable environment with infrequent changes." Tr. 68.

*David Demuth, M.D.*

Upon reconsideration, on November 5, 2013, state agency reviewing psychologist David Demuth, M.D., completed a Psychiatric Review Technique and Mental RFC Assessment.  Tr.

78-81.  As part of the Psychiatric Review Technique, Dr. Demuth opined that Nicholson had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  Tr. 65.

In assessing Nicholson's Mental RFC, Dr. Demuth opined that Nicholson had no limitations in understanding and memory.  Tr. 80.

In the area of sustained concentration and persistence, Dr. Demuth opined that Nicholson had moderate limitations in the following categories: ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 80.  Dr. Demuth explained further that Nicholson's "mental health issues would cause reduced concentration, schedule and stress tol[erance] but residual remains to complete 1-3 step tasks."  Tr. 80.

In the area of social interaction, Dr. Demuth opined that Nicholson had marked limitations in his ability to interact appropriately with the general public.  Tr. 80.  Also, Dr. Demuth opined that Nicholson had moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 80-81.  Dr. Demuth explained further that Nicholson "is markedly reduced for public interactions.  He can relate on a

superficial basis to coworkers and supervisors.  He would work best in small group or alone."
Tr. 81.

In the area of adaptation, Dr. Demuth opined that Nicholson had moderate limitations in his ability to respond appropriately to changes in the work setting.  Tr. 81.  Dr. Demuth explained further that Nicholson's "mental health issues would cause reduced ability to respond to change in the work setting but residual remains to complete 1-3 step tasks."  Tr. 81.

## C.     Testimonial evidence

### 1.     Plaintiff's testimony

Nicholson was represented at and testified at the hearing.  Tr. 38-51.  Nicholson explained that he was currently receiving treatment and Coleman and had been treated at Portage Path in the past.  Tr. 39-40.  The only medication he was taking was Risperdal. Tr. 40.  He started taking Risperdal a couple months prior to the hearing.  Tr. 40.  Nicholson indicated that the only side effect he had from taking the Risperdal was drowsiness.  Tr. 40.  He reported taking Lamictal and Vistaril in the past but changes were made because he was having bad side effects. Tr. 40.  Nicholson stated that he switched from Portage Path to Coleman because he had a difficult time making appointments at Portage Path and two different doctors quit.  Tr. 40.  At Coleman, Nicholson was receiving counseling services and he was seeing a physician who prescribed medication.  Tr. 40.

Nicholson indicated that he had a wide range of emotions.  Tr. 41.   He indicated he "can be very low and extremely depressed or very hostile and angry."  Tr. 41.  When Nicholson is in a "low period," Nicholson indicated he is "very isolated almost all the time."  Tr. 41.  He battles his "thoughts for extended periods of time, replaying bad events.  Kind of getting stuck in bad thought loops . . . just trying to get through it."  Tr. 42.  Sometimes Nicholson has days when he

feels "very hopeless and everything is just heavy and dark.  And some days it's a lot more anger filled."  Tr. 42.   Nicholson estimated having "really bad days" at least once a week and sometimes more.  Tr. 42.   In attempting to cope with all of his emotions and get through the day, Nicholson has cut himself.  Tr. 42.  He isolates himself because being around other people tends to make things worse.  Tr. 42.  He fights with people and scares people with his outbursts. Tr. 42. Nicholson has noticed a little improvement in his symptoms since starting on the Risperdal.  Tr. 42-43.   Nicholson said he sometimes has neutral days.  Tr. 42.   On a neutral day, Nicholson explained that his thoughts are less intrusive, he obsesses less about bad things, and he can maybe get out for a walk or watch a movie.  Tr. 43.   Nicholson's anger and hostility comes in cycles and can be triggered by many things. Tr. 44, 49-50.   Things that start as minor annoyances can end up making Nicholson really mad.  Tr. 44.

Nicholson reported living in a friend's basement.  Tr. 43.   He has known that friend for at least five years.  Tr. 43.  Nicholson cooks his own food.  Tr. 44.  He usually microwaves his food.  Tr. 44.  He can go to the store by himself but he sometimes gets frustrated and mad.  Tr. 44.  Just being around too many people sets him off and he gets anxious thinking people are watching him.  Tr. 44.  Nicholson indicated that he gets extremely angry multiple times each week.  Tr. 44.  When he gets angry he tries to keep to himself and avoid causing actual damage or fighting with anyone.  Tr. 44.  He has hurt himself in the past and gotten into altercations with others which have involved screaming and fighting.  Tr. 45.   Nicholson has a friend that drives him to counseling.  Tr. 46.  On occasion, Nicholson takes the bus but doing so is a very uncomfortable experience for him. Tr. 46.   Nicholson has gotten off buses early and walked the rest of the way to his destination if there are too many people on the bus because it makes him uncomfortable and angry.  Tr. 46-47.

Nicholson has lost jobs because of fighting with people at work. Tr. 45. Also, he has missed work because he is too depressed to get up. Tr. 45. Nicholson has had girlfriends in the past but they have ended on bad terms. Tr. 48, 50-51. Nicholson has not been able to maintain relationships because of his unstable periods. Tr. 48. Nicholson has been able to manage living in the basement of his friend's home because his friend pretty much leaves him alone and is sympathetic to Nicholson's problems. Tr. 48-49. Nicholson interacts with the friend with whom he lives once or twice each week. Tr. 48-49.

### 2. Vocational Expert

Vocational Expert ("VE") Lynn Smith testified at the hearing. Tr. 52-58. The ALJ indicated that he had concluded that none of Nicholson's prior jobs, which were mostly short-term, met the requirements of past relevant work. Tr. 53.

The ALJ asked the VE to assume an individual born in 1989 with a high school education who had no exertional limitations but had the following non-exertional limitations: limited to simple, routine tasks that do not involve arbitration, negotiation or confrontation; cannot direct the work of others and cannot be responsible for the safety or welfare of others; cannot perform piece rate work or assembly line work; and is limited to occasional interaction with others. Tr. 53. The VE indicated that there would be jobs in the national economy that someone with those limitations would be able to perform, including (1) cleaner, a medium, unskilled job; (2) laundry worker, a medium, unskilled job; and (3) kitchen helper, a medium, unskilled job.[4] Tr. 54.

The ALJ asked the VE to consider the following additions/modifications to the first hypothetical – the individual can have no more than incidental contact with the general public and is limited to less than occasional – defined as less than 10% of the day – interaction with

---

[4] The VE provided regional, state and national job incidence data for each of the identified jobs. Tr. 54.

coworkers and supervisors.  Tr. 55.   Based on those limitations, the VE indicated that there

would be no jobs available for the described individual.  Tr. 55.

The ALJ then asked the VE to consider the first hypothetical with the additional

limitation of missing work an average of at least one day per week because of emotional issues

in cycling. Tr.  55-56.  The VE indicated that there were no jobs that the hypothetical individual

could maintain.  Tr. 56.

In response to Nicholson's counsel's questioning, the VE indicated that repeated

instances of hostility by the worker that caused coworkers and supervisors to be fearful of the

worker would affect maintainability of the job.  Tr. 56-57.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[5] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his May 19, 2015, decision, the ALJ made the following findings:[7]

1.      Nicholson meets the insured status requirements of the Social Security Act through June 30, 2015.  Tr. 21.

2.      Nicholson has not engaged in substantial gainful activity since February 1, 2013, the alleged onset date.  Tr. 21.

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[7] The ALJ's findings are summarized.

3.      Nicholson has the following severe impairments: episodic mood disorder, personality disorder, and intermittent explosive disorder.  Tr. 21.

4.      Nicholson does not have an impairment or combination of impairments that meets or medically equals the severity of the Listings.  Tr. 21-23.

5.      Nicholson has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others.  Nicholson cannot perform piece rate work or assembly line work.  He is limited to only occasional interaction with others.  Tr. 23-26.

6.      Nicholson has no past relevant work.  Tr. 26.

7.      Nicholson was born in 1989 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 27.

8.      Nicholson has a limited education and is able to communicate in English. Tr. 27.

9.      Transferability of job skills is not an issue because Nicholson does not have past relevant work.  Tr. 27.

10.     Considering Nicholson's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Nicholson can perform, including cleaner, laundry worker, and kitchen helper.  Tr. 27.

Based on the foregoing, the ALJ determined that Nicholson had not been under a disability, as defined in the Social Security Act, from February 1, 2013, through the date of the decision.  Tr. 28.

## V. Parties' Arguments

Nicholson argues that the ALJ erred because he did not include limitations in the RFC to account for his intermittent explosive disorder.  Doc. 16, pp. 8-14; Doc. 20.  He contends that the limitations included in the RFC do not adequately account for his propensity to be

20

confrontational with others and have episodes of anger and rage and the ALJ should have accepted his subjective allegations as fully credible. *Id.*

The Commissioner argues that the RFC is supported by substantial evidence and the ALJ properly found that Nicholson's subjective allegations regarding the extent of his limitations were not entirely credible. Doc. 19, pp. 10-15.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in assessing Nicholson's RFC**

Nicholson argues that the ALJ committed error by failing to account for intermittent explosive disorder in the RFC.  Nicholson's argument is based, in part, on his claim that the ALJ did not properly assess his credibility.

Nicholson's argument is without merit.  The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 404.1527.  "The Social Security Act instructs that the ALJ—not a physician— ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010); *see also Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.").

In assessing Nicholson's RFC, the ALJ considered evidence regarding Nicholson's irritability, anger, and outbursts, and difficulty getting along with others.  Tr. 23, 26.

Nicholson relies on a treatment record from June 11, 2015, to support his claim that the ALJ did not sufficiently consider or account for his tendency to become angry.  For example, Nicholson argues that the June 11, 2015, treatment record shows that he was belligerent with his own counselors.  Doc. 16, pp. 11, 12.  However, the June 11, 2015, therapy session occurred after the ALJ issued his decision on May 19, 2015.  Thus, to the extent that Nicholson contends that the ALJ ignored evidence, his claim is without merit.  Furthermore, the ALJ considered in detail Nicholson's mental health treatment history, finding that Nicholson "displayed largely cooperative behavior at his exams."  Tr. 22, 24-25.  This finding is supported by the record.  *See* Tr. 287, 298, 301, 303, 305, 307, 316, 321.  Furthermore, even if substantial evidence or indeed a

preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Nicholson also argues that his anger and fighting has affected his ability to maintain employment in the past.  Doc. 16, p. 11.  However, as discussed below, the ALJ did not find Nicholson's allegations regarding the reasons for unemployment entirely credible.  Tr. 26.

As far as opinion evidence, Nicholson's treating psychologists/psychiatrists did not provide opinions regarding his impairments.  However, there were consultative and reviewing psychological opinions, which the ALJ considered and weighed when assessing Nicholson's RFC.  Tr. 25-26.  Consistent with the opinions of the consultative and reviewing psychologists/psychiatrists, the ALJ concluded that Nicholson had moderate restrictions in activities of daily living, social interaction, and concentration, persistence or pace.  Tr. 22. Further, in considering the opinion evidence, the ALJ explained that, "while [Nicholson] had ongoing mental symptoms and he struggled to interact with others, the balance of the evidence shows that [he] remained capable of performing unskilled work" and "despite his . . . irritability, he generally retained . . . cooperative behavior."  Tr. 26.

The ALJ considered Nicholson's activities of daily living and social interaction with others, noting that, while Nicholson had recently broken up with his girlfriend, he had lived with her.  Tr.  22.  Also, the ALJ considered that Nicholson did have some friends, shopped and rode public transportation.  Tr. 22.

Additionally, the ALJ considered Nicholson's subjective allegations regarding the limiting effects of his mental impairments, including statements that he "often lost his temper" and "had difficulty . . . getting along with others."  Tr. 23.   The ALJ found that his statements

concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible.  Tr. 23-25.  Nicholson contends that the ALJ erred in this regard and should have found his allegations entirely credible because his allegations are consistent with the record. Doc. 16, pp. 11-12.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").

Here, in addition to thoroughly discussing the record evidence, the ALJ provided a detailed explanation of his reasons for not finding Nicholson's subjective allegations entirely credible.  The ALJ stated:

> With respect to the claimant's alleged limitations, I find such assertions only partially credible.  He had some gaps in treatment and complaints during the relevant period.  He said that his homelessness and financial constraints limited his ability to seek treatment, but he simply failed to return for treatment at times. One would expect a person with the degree of limitations that the claimant described would maintain consistent treatment.
>
> Furthermore, the record failed to substantiate the claimant's allegations.  While there is evidence of previous instances of self-harm, there was no indication of any such incidents during the relevant period.  Moreover, the claimant testified that he isolated himself, but the record shows that he had some friends and he had a girlfriend throughout the alleged period of disability, contradicting his claims.

24

> There was no indication in the record to confirm his assertions of substantial drowsiness or dizziness due to his medications. Finally, the earnings record reflects that he worked only sporadically prior to the alleged onset date (6D). He also noted that his prior theft convictions made it difficult for him to find work (5F/7). Such facts raise a question as to whether his medical conditions were the cause of his ongoing unemployment.

Tr. 26.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)). Here, Nicholson has not shown that the ALJ did not sufficiently explain his credibility determination nor has Nicholson shown that the ALJ's determination that his subjective allegations were not entirely credible is not supported by substantial evidence. Additionally, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Considering the foregoing, the Court finds no basis upon which to conclude that the ALJ erred in finding Nicholson's subjective allegations not entirely credible.

In summary, here the ALJ concluded that intermittent explosive disorder was a severe impairment. The ALJ then proceeded to consider and assess the extent of any work-related limitations based on the evidence of record in this case, including evidence regarding Nicholson's irritability, anger, and outbursts. Having considered all the evidence, the ALJ concluded that Nicholson's impairments caused work-related limitations but not to the extent as alleged by Nicholson. The ALJ concluded that Nicholson had the RFC to perform work at all exertional levels with the following RFC mental limitations:

[S]imple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others.  The claimant cannot perform piece rate work or assembly line work.  He is limited to only occasional interaction with others.

Tr. 23.

Nicholson has not shown that the RFC assessment is not supported by substantial evidence or that the RFC limitations do not adequately account for his intermittent explosive disorder.  Furthermore, contrary to Nicholson's claim, the ALJ sufficiently explained his decision.  For example, in considering the evidence, the ALJ explained that, "while [Nicholson] had ongoing mental symptoms and he struggled to interact with others, the balance of the evidence shows that [he] remained capable of performing unskilled work" and "despite his . . . irritability, he generally retained . . . cooperative behavior."  Tr. 26.

For the reasons discussed herein, the Court finds no basis to order this matter reversed and remanded.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: March 15, 2017

Kathleen B. Burke
United States Magistrate Judge

26